## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JUAN SOTO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| CICERO POLICE DEPARTMENT, | ) | |
| AND TOWN OF CICERO | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES Plaintiff, JUAN SOTO ("Plaintiff" or "SOTO"), by and through his attorneys, TRENT LAW FIRM, P.C., complaining against the Defendants in this matter, CICERO POLICE DEPARTMENT and TOWN OF CICERO (hereinafter collectively "CICERO" or "Defendants"), states as follows:

## NATURE OF THE ACTION

This is an action for declaratory and injunctive relief and for damages against the defendants to enforce the Plaintiff's rights granted under the United States' Constitution pursuant to 42 U.S.C. § 1983 and redress the deprivation of Plaintiff's rights secured by Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e *et seq.*) ("Title VII"), under the Age Discrimination in Employment Act of 1967, the "ADEA,", and for state law causes of action.

## PARTIES

1.      Plaintiff is an adult, Mexican born American citizen over forty (40) years of age who resides within the territorial jurisdiction of the District Court.

2.     CICERO is an Illinois Municipal Corporation and/or Township Corporation, with its principal place of business in Cicero, Cook County, Illinois.

3.     The Town of CICERO operates the Cicero Police Department.

4.     At all relevant times, CICERO employed more than fifteen (15) employees and was Plaintiff's employer.

5.     CICERO, at all times relevant to this Complaint, operated within the territorial jurisdiction of the District Court.

## JURISDICTION

6.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, as the district courts have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States, and its supplemental jurisdiction over state law claims under 28 U.S.C. § 1367 as they arise from the same core of operative facts as give rise to Plaintiff's federal law claims.

7.     As SOTO was more than 40 years old at the time, he seeks to redress CICERO'S violation of his rights under the Age Discrimination in Employment Act of 1967, the "ADEA," specifically, 29 U.S.C. §§ 621, 623(f)(2)(B), 626(b), 630(b).

8.     Jurisdiction in this matter also arises under the regulations adopted pursuant to the ADEA, 29 C.F.R. §§ 1625 and 1630.12(a).

9.     Jurisdiction is also invoked pursuant to the anti-retaliation provisions of Title VII, of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §§ 2000e-3(a); 2000e—5(g)(1); 42 U.S.C. § 12203(a) (defining retaliation) and the anti-retaliation provisions of the ADEA, 29 U.S.C. § 623(d).

10.     Jurisdiction is invoked pursuant to 42 U.S.C. § 1981 including 42 U.S.C. §

1981a(c)(2) (limits do not apply to back pay or front pay, which is awarded under 42 U.S.C. § 2000e5(g)(1)).

11.    All jurisdictional prerequisites to a lawsuit have been met to wit:

a.    On August 28, 2018, SOTO filed a charge of discrimination alleging discrimination based on national origin which was perfected by the Illinois Department of Human Rights ("IDHR") and by a work sharing agreement between the Department and the Equal Employment Opportunity Commission ("EEOC") was cross-filed and perfected at both agencies;

b.    The charge was filed at the IDHR (*see* Exhibit A);

c.    The charge was perfected by the IDHR and thus was perfected at both the IDHR and the EEOC (*see* Exhibit A);

d.    The charge was assigned EEOC Charge No. 2019CF0270;

e.    The charge pursuant to the work-sharing agreement between agencies was filed within 300 days of the date of the last act of discrimination, retaliation and harassment, which was and were on-going through the date SOTO retired;

f.    On September 13, 2019, SOTO filed additional charges of discrimination alleging discrimination based on age discrimination, hostile work environment due to age, retaliation due to age, hostile work environment due to national origin, and retaliation due to national origin which was perfected by the EEOC and by a work sharing agreement between the EEOC and the IDHR was cross-filed and perfected at both agencies;

g.    The charge was filed with the EEOC (*see* Exhibit A);

h.    The charge was perfected by the EEOC and thus was perfected at both the EEOC and the IDHR (*see* Exhibit A);

i.     The charge was assigned EEOC Charge No. 440-2019-07661;

j.     The charge pursuant to the work-sharing agreement between agencies was filed within 300 days of the date of the last act of discrimination, retaliation and harassment, which was and were on-going through the date SOTO retired;

k.     SOTO received a Right-to-Sue letter from the EEOC dated November 14, 2019 (*see* Exhibit B);

l.     This lawsuit is being filed within 90 days of the date of receipt of the Right-to-Sue letter (*see* Exhibit B);

12.     SOTO is raising claims at this point without having stated it in his charge as said claims are like and related to claims previously alleged and all flow out of a common nucleus of operative facts and parties.

## VENUE

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because:

a.     Defendant CICERO, is a municipality in this court's jurisdictional district; and

b.     All events or omissions giving rise to Plaintiff's claims occurred here in this jurisdictional district.

## FACTS

14.     Defendants are local governmental entities, are and were, at all times relevant, "employers" and/or "covered entities" within the meaning of Title VII of the Civil Rights Act of 1964.

15.     CICERO hired SOTO on or about January 1, 1999 to work as a full-time, sworn police officer for the Town of Cicero Police Department.

16.     In November 2001, SOTO was assigned to the Detective Division of the Cicero Police Department, Star number 490, and eventually became the senior detective with top seniority.

17.     SOTO held the position of detective until August 2018.

18.     During the course of his employment with CICERO, SOTO always received excellent annual reviews which were signed by various Sergeants, the Deputy, First Deputy, and Superintendent.

19.     In his last detective evaluation while employed with CICERO, Deputy of Investigations Frank Diaz ("DIAZ"), Star number 104, indicated that SOTO should be in a supervisory position based on his experience and knowledge.

20.     SOTO has only one write-up, which occurred before 2001, when he received a suspension day for an auto (squad) accident.

21.     Police Superintendent Jerry Chlada, Jr. ("CHLADA") is the Police Superintendent for CICERO.

22.     That upon information and belief, CHLADA is American of Italian descent.

23.     CHLADA was promoted from patrol officer to Commander, then to First Deputy, and finally to Police Superintendent.

24.     Nino Scimone ("SCIMONE") is a Captain for CICERO.

25.     That upon information and belief, SCIMONE is American of Italian descent.

26.     SCIMONE was promoted from Sergeant to Captain by Police Superintendent CHLADA in 2018.

27.     That Dominic Schullo, Star number 105, ("SCHULLO") is the Assistant Deputy Superintendent for CICERO.

28. That upon information and belief, SCHULLO is American of Italian descent.

29. SCHULLO was promoted from patrol officer to Assistant Deputy Superintendent.

30. That upon information and belief, Commander Auriemma ("AURIEMMA") is American of Italian descent.

31. That AURIEMMA was promoted from Detective to Commander.

32. That Angie Ingve ("INGVE"), Star 475, is an American of Mexican descent and over forty (40) years of age.

33. SOTO was born in Piedras Negras, Coahuila, Mexico.

34. That on August 7, 2018 at approximately 11:32 Hours, SOTO was the driver of an unmarked police squad, number 252, stopped at the intersection of Cermak Road and Central Avenue, in Cicero, Illinois, when Cicero Police & Fire Dispatch put over the air a radio transmission of an aggravated vehicular hijacking which had just occurred at 16th Street and Central Avenue, also in Cicero, Illinois. (Cicero Police Report # 201800066526)

35. At which time, SOTO activated his emergency lights and siren, and SOTO his partner, INGVE, proceeded to the intersection of 16th Street and Central Avenue.

36. While in route to said intersection, Cicero Police & Fire Dispatch put over the air several radio transmissions, which included the make and model of the victim's vehicle, as well as a description of the unknown African American male subject/offender.

37. That upon reaching said intersection, SOTO and INGVE, were directed towards the direction in which the unknown offender had driven off in the victim's vehicle, being westbound on 16th Street from Central Avenue, by the victim and several pedestrians.

38. That SOTO and INGVE then proceeded to drive westbound on 16th Street, until reaching the intersection of 16th Street and Austin Boulevard, in Cicero, Illinois. Turning north

on Austin Boulevard towards Interstate 290, believing that the unknown offender would drive towards the City of Chicago, as many of the aggravated vehicular hijacking offenders have done so in the past.

39.     That unable to locate said unknown offender and/or the victim's vehicle, SOTO and INGVE, returned back towards the Chicago/Cicero border, driving eastbound on Roosevelt Road, until reaching the intersection of Roosevelt Road and Central Avenue.

40.     That SOTO and INGVE drove northbound on Central Avenue, past Interstate 290, until reaching the intersection of Central Avenue and Jackson Boulevard, in Chicago, Illinois and then proceeded to drive eastbound on Jackson Boulevard, until reaching the intersection of Jackson Boulevard and Cicero Avenue before turning southbound onto Cicero Avenue, towards Interstate 290.

41.     That upon reaching Interstate 290, SOTO received a text message from his other partner, who was inside the police station, Detective Arturo De La Fuente ("DE LA FUENTE"), Star number 493, stating that SCHULLO had approached him and asked as to which squad number SOTO was currently in. After providing him with said information, DE LA FUENTE related that he observed SCHULLO tracking SOTO's squad in the department's GPS system.

42.     That after receiving said information from DE LA FUENTE, SOTO then contacted his supervisor, DIAZ, advising him of the information that SOTO had just received, to which he stated to SOTO that he would take care of it.

43.     That shortly thereafter, SOTO received a text message from SCIMONE asking SOTO as to what he was doing in the City of Chicago.

44.     That SOTO, being the driver of the vehicle, asked INGVE to call SCIMONE, to which she did, advising him that SOTO and INGVE were in search of the unknown offender and of the victim's vehicle.

45.     That immediately thereafter, CHLADA got on the radio, calling INGVE, and requesting SOTO's and INGVE'S location.

46.     That INGVE then advised back over the air, along with the reason, regarding the reported aggravated vehicular hijacking, after CHLADA had asked for one over the air.

47.     SOTO and INGVE then proceeded to check the area of 15th Street and Tripp Avenue, in Chicago, Illinois, where many stolen vehicles had been recovered in the past, before heading back into the station, Cicero Police Department.

48.     That after arriving at the station, SOTO and INGVE, in the presence of DE LA FUENTE, were approached by SCHULLO, who numerous times stated to and questioned SOTO and INGVE as to why they were at the intersection of Harlem Avenue and Cermak Road, in Berwyn, Illinois, when said aggravated vehicular hijacking call came out.

49.     That SOTO and INGVE responded to SCHULLO that they were not at the intersection of Harlem Avenue and Cermak Road, in Berwyn, Illinois, and SCHULLO replied that the GPS had them at that location.

50.     That several minutes later, INGVE was called on the radio by Officer Edwin Arocho ("AROCHO"), Star number 267, asking her three (3) times if she and SOTO were going to speak with the victim on scene to which INGVE related that they were not since it is the Robbery/Burglary Task Force which handles said investigations.

51.     That upon advising AROCHO on the third radio call that they were not going to speak with the victim on the scene, CHLADA then angrily requested that the Cicero Police & Fire

Dispatch email him the last radio transmission immediately, as well as CHLADA stating on the air that he would take care of it himself.

52.     That several hours later, while still in the station, SOTO was approached by Detective Sergeant Chris Wojtowicz ("WOJTOWICZ"), asking that SOTO and INGVE join him in DIAZ'S office for a meeting.

53.     Present at the above-referenced meeting were SOTO, INGVE, WOJTOWICZ, and DIAZ and, at which time, SOTO and INGVE were advised by DIAZ, that per CHLADA, they were being demoted to the patrol division for not meeting with the victim of the aggravated vehicular hijacking.

54.     That DIAZ additionally stated that CHLADA was being unreasonable by going from one extreme to the other and that CHLADA should be "writing them up" instead of demoting SOTO and INGVE.

55.     That DIAZ also stated that he did not know why CHLADA "had it in" for SOTO.

56.     That neither SOTO nor INGVE were ever dispatched to the call, nor were they ever requested to the scene by a supervisor as is stated in the department's general orders.

57.     That Cicero Police Department General Order: 42-01-01/Section 2e states that the assigned patrol officer is to call his or her field supervisor, to then make the determination if investigative support is needed.

58.     That neither SOTO nor INGVE, nor any other detectives, or the Robbery Burglary Team, who were in the station and who were assigned all vehicular hijacking investigations, were called regarding the above-referenced incident on August 7, 2018.

59.    That on August 16, 2018, SOTO received an email from Deputy Superintendent of Patrol Thomas Boyle ("BOYLE"), Star number 103, advising SOTO that he was being assigned to the patrol division - 1st Watch (Midnights), with INGVE being assigned to the patrol division - 3rd Watch (Afternoons) effective August 23, 2018.

60.    That on August 20, 2018, SOTO met with Union President/Officer Manuel Velasquez ("VELASQUEZ"), Star number 264, filing a grievance against CHLADA, for his reassignment without due process, violating 50 ILCS Sec 725/7.

61.    That on October 19, 2018, SOTO was instructed by Captain Mathew Ramirez ("RAMIREZ") after roll call, to meet with WOJTOWICZ in his office.

62.    That upon entering WOJTOWICZ'S office, WOJTOWICZ presented SOTO with a Written Reprimand for the incident on August 7, 2018 that lead to his reassignment to the Patrol Division, two (2) months after the original incident.

63.    That SOTO asked for union representation, to which WOJTOWICZ denied SOTO'S request by stating "no" and telling SOTO to just sign it which SOTO refused.

64.    SOTO then requested copies of the Written Reprimand in order to show it to his union representative, to which WOJTOWICZ again denied SOTO'S request by stating "no," that not until SOTO signed the written reprimand.

65.    SOTO then advised that he wasn't going to sign the written reprimand because he did not do anything improper and SOTO was never given a "direct order" to any paperwork.

66.    That subsequently later that morning, SOTO spoke with VELASQUEZ and advised him of the meeting with WOJTOWICZ.

67.    That VELASQUEZ then had a meeting with DIAZ who related that CHLADA was extremely upset that SOTO didn't sign the Written Reprimand and VELASQUEZ advised SOTO

that he would be receiving a "direct order" to sign it, and that SOTO must obey said direct order, or he could be terminated.

68.     That on October 21, 2018, SOTO was instructed by Commander Rodolfo Flores ("FLORES") after roll call, to meet with WOJTOWICZ in his office.

69.     That SOTO along with officer Margarito Porras ("PORRAS"), Star number 246, met with WOJTOWICZ in his office whereby WOJTOWICZ gave SOTO a "direct order" to sign the Written Reprimand.

70.     That as a result of the "direct order," SOTO signed the written reprimand and was allowed to make a copy for himself and his union representative.

71.     That the written reprimand was signed and filled out by both DIAZ and WOJTOWICZ, neither of whom were at work during the time of the initial August 7, 2018 incident, which lead to SOTO being reassigned to the patrol division.

72.     That this written reprimand was a violation of the Uniform Peace Officers' Disciplinary Act in that SOTO had already been disciplined, by being demoted to patrol, and SOTO had filed a grievance due to the improper demotion.

73.     That SOTO spoke with Sergeant Eduardo Zamora ("ZAMORA"), Star number 147, who related to SOTO that he wasn't surprised that SOTO had been demoted to patrol, since ZAMORA had previously spoken to SCIMONE who stated that the older detectives were set in their ways and that had to change.

74.     That SCIMONE would create a hostile work environment, in pertinent part, without limitation, by questioning case procedures and going against what state's attorneys were requesting; speaking to SOTO in a loud tone and aggressive manner and instructing SOTO to look at him when SCIMONE spoke to him; not allowing SOTO to get the desired work cubicle

which was customary based on seniority and SOTO had the top seniority with detectives; stating to SOTO that his guy, in reference to CHLADA, was bigger than SOTO'S guy, in reference to DIAZ, and that he didn't care if SOTO "ran" to tell on him; sending SOTO to two (2) different schools/classes, as a form of punishment in the summer of 2017; and leaving SOTO on a hospital detail in September 2018 for an hour after SOTO was to have his shift ended and SCIMONE stated to the front desk aide that he had forgotten about SOTO.

75.     That on or about September 2018 per CHLADA, the officers who were assigned to Burglary-Robbery Team were all promoted to Detectives and, upon information and belief, are younger than forty (40) years of age, and none of them were state certified as a detective.

76.     That beginning in August 2018 SOTO had asked SCIMONE, FLORES, Captain Mathew Ramirez ("RAMIREZ"), and ZAMORA, repeatedly for the following items: (1) new patrol badge since SOTO was forced to work in the patrol division with his detective badge; (2) new vest cover patches, since SOTO'S vest patches displayed detective on them; (3) passwords to squad car computer; (4) OC Spray; and (5) new work identification card.

77.     That on October 8, 2018, ZAMORA asked to meet with SOTO after he had spoken with FLORES who advised ZAMORA that Deputy of Patrol Thomas Boyle ("BOYLE") wanted to know why SOTO was allegedly abusing his sick days.

78.     That SOTO had used only three (3) sick days from August 2018 to October 2018, as family sick days since his father was recovering from colon cancer.

79.     That SOTO had saved approximately two hundred (200) sick days throughout his career and, upon information and belief, BOYLE had not questioned younger officers about their sick days.

80.     That since being assigned and demoted to the patrol division from the detective division, SOTO was being requested by supervisors to perform the following detective actions which occurred by him being called into the office, and never dispatched:

a.      That on September 3, 2018, regarding Homicide Investigation/Case # 18-74137, SOTO was ordered by WOJTOWICZ to transport the offender to the station and preserve evidence, gunshot residue, from the offender's hands and place him in and turn on the electronic interview room;

b.      That also in September 2018, regarding an Attempted Murder Investigation, SOTO was sent to Saint Anthony's Hospital to speak with the doctor, victim, and any witnesses;

c.      That on October 14, 2018, regarding Aggravated Domestic Battery/Unlawful Restraint Investigation/Case # 18-86036 SOTO was ordered to take the investigation/report over from another officer since he was previously a detective;

d.      That on October 16, 2018, regarding Residential Burglary Investigation/Case # 18-86560, SOTO was ordered to lift latent prints because there were no detectives available; and

e.      On October 31, 2018, regarding Battery Investigation/Case # 18-90762, SOTO was ordered to go to Mount Sinai Hospital on a possible shooting victim.

81.     That, upon information and belief, CHLADA was constantly checking the cameras to see the times that SOTO would arrive and leave work.

82.     That, upon information and belief, CHLADA was tracking SOTO'S vehicular GPS for weeks at time to track SOTO'S movement.

83.     That CHLADA ordered SOTO to be written up in October 2018 for the alleged same misconduct dating to August 7, 2018, two (2) months after SOTO was already demoted.

84.     That on or about December 2018, SOTO was constructively terminated and submitted his retirement request to the Police Superintendent with his last physical day being December 31, 2018 and official last day being February 21, 2019.

85.     SOTO had received only one (1) write-up his entire career, which was for an auto accident, prior to the following acts by the Cicero Police Department

86.     SOTO has had outstanding annual work evaluations prior to these acts by the Cicero Police Department.

87.     During the course of his employment, SOTO completed all of his goals and met or exceeded his job duties.

88.     That upon information and belief, all supervisors and managers harassing and discriminating against SOTO during the course of his employment were non-Hispanic.

89.     That other similarly situated employees were not subjected to such disciplinary actions.

90.     That at all times SOTO had properly carried out his duties.

91.     That the Defendants failed to remedy SOTO's complaints of discrimination and failed to take adequate remedial steps to ensure that the ongoing harassing workplace environment cease.

92.     That despite SOTO's complaints, he had to continue enduring a harassing and hostile work environment.

93.     That SOTO was constructively terminated in that he was forced to submit his resignation in December 2018.

## COUNT I
### Age Discrimination

94.    SOTO restates and realleges Paragraphs 1-93 as if fully stated herein.

95.    The Age Discrimination in Employment Act of 1967, as amended, prohibits discrimination based on age.

96.    SOTO had been praised for doing his job and continued to perform according to company expectations.

97.    SOTO was discharged due to his age, over 40, at the time of his discharge.

98.    SOTO was damaged as a result of the discharge from his employment in that he lost wages and incurred mental stress and humiliation.

WHEREFORE, SOTO respectfully requests that the Court:

A.    Find that CICERO discriminated against Plaintiff, in violation of The Age Discrimination in Employment Act of 1967, as amended;

B.    Award Compensatory and punitive damages to the maximum amount provided by statute;

C.    Award all back pay lost since the date of constructive termination plus pre-judgment interest;

D.    Award attorney's fees, expert witness fees, and costs as provided by law;

E.    Award Front Pay;

F.    Retain jurisdiction over this action to assure full compliance with the order of this Court and with applicable law; and

G.    Grant such additional relief as this Court deems just and proper.

## COUNT II
### Retaliation Based on ADEA – Demotion

99.    SOTO incorporates by reference Paragraphs 1-98 as if fully stated herein.

100.    SOTO incorporates the allegations and facts contained in his Charges of Discrimination filed with the Department and EEOC and reiterates the same as if fully set forth herein.

101. In August 2018, SOTO was demoted for allegedly failing to interview a witness and constructively terminated in December 2018 when he was forced to resign.

102. The real reason in conjunction with Count I or in the alternative thereto, was that he was constructively terminated in retaliation for him exercising his rights under the ADEA.

103. CICERO'S termination is in violation of the anti-retaliation provisions of the ADEA as applicable under Title VII.

104. Because of CICERO constructively terminating SOTO and forcing him to resign in December 2018, SOTO suffered lost wages and fringe benefits, embarrassment, humiliation, insult and emotional suffering because of the civil rights violations committed against him as set forth in this Count by CICERO.

WHEREFORE, SOTO seeks the following relief from CICERO:

A. That CICERO be directed to pay SOTO a sum equal to the damages he has suffered as a result of the embarrassment, humiliation, insult and emotional suffering as a result of the civil rights violation committed against him by CICERO;

B. That CICERO be directed to pay SOTO a sum equal to all lost wages and fringe benefits suffered as a result of him being terminated in December 2018;

C. That CICERO be ordered to pay pre-judgment and post-judgment interest on any amounts found to be owed;

D. That CICERO be ordered to pay SOTO front pay in an amount deemed to make him whole had he not been a victim of discrimination;

E. That CICERO clear from SOTO'S personnel records all references to the filing of this charge and the subsequent disposition thereof;

F. That CICERO pay reasonable attorney's fees to the undersigned counsel and costs incurred as a result of the civil rights violation alleged therein; and

G. That such other and further relief be awarded as may be necessary to make SOTO whole.

## COUNT III
### Willful Under the ADEA

105. SOTO incorporates by reference Paragraphs 1-104 as if fully stated herein.

106. When acts of age discrimination were engaged in, they were willful and intentional in the sense that CICERO knew or reasonably should have known that its actions violated the ADEA, or they engaged in the acts with reckless disregard of the requirements of the ADEA.

WHEREFORE, SOTO seeks the following relief from CICERO:

A. That CICERO be directed to pay SOTO a sum equal to double the damages he has suffered as a result of the civil rights violation committed against him by CICERO;

B. That CICERO clear from SOTO'S personnel records all references to the filing of this charge and the subsequent disposition thereof;

C. That CICERO pay reasonable attorney's fees to the undersigned counsel and costs incurred as a result of the civil rights violation alleged therein; and

D. That such other and further relief be awarded as may be necessary to make SOTO whole.

## COUNT IV
### Hostile Work Environment Due To Age Discrimination

107. Plaintiff restates and realleges Paragraphs 106 as if specifically set forth herein.

108. The Age Discrimination in Employment Act of 1967, as amended, makes it unlawful for an employer to discriminate against an employee on the basis of age and affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.

109. SOTO belongs to a protected group.

110. SOTO was repeatedly subjected to unwanted harassment based on his age as set forth above.

111. CICERO knew and/or should have known of the harassment and failed to take prompt remedial action.

112. At all times hereto, SOTO acted reasonably under the circumstances.

113. SOTO was constructively terminated in that he was forced to resign due to the hostile work environment inflicted upon him.

114.    CICERO is liable for the age discrimination due to a hostile work environment inflicted upon SOTO due to CICERO'S violation of The Age Discrimination in Employment Act of 1967, as amended, as set forth above.

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Find that Defendant discriminated against Plaintiff, in violation of The Age Discrimination in Employment Act of 1967, as amended;
B.    Award compensatory and punitive damages to the maximum amount provided by statute;
C.    Award all backpay lost since the date of constructive termination plus pre-judgment interest;
D.    Award attorney's fees, expert witness fees, and costs as provided by law;
E.    Award front pay;
F.    Retain jurisdiction over this action to assure full compliance with the order of this Court and with applicable law; for forward pay due to decrease in lower earnings; and
G.    Grant such additional relief as this Court deems just and proper.


## COUNT V
### Title VII National Origin Discrimination

115.    Plaintiff restates and realleges paragraphs 1-114 as if specifically set forth herein.

116.    42 U.S.C. § 2000e-2(a) makes it unlawful for an employer to discriminate against an employee on the basis of national origin.

117.    Similarly situated non-Hispanic employees have been treated differently than Defendant under similar circumstances.

118.    Plaintiff was constructively terminated by non-Hispanic supervisors.

119.    Defendant violated 42 U.S.C. § 2000e-2(a) by treating Plaintiff differently than similarly situated non-Hispanic employees because of his national origin, as set forth above.

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Find that Defendant discriminated against Plaintiff, in violation of Title VII of the Civil Rights Act of 1964;
B.    Award compensatory and punitive damages to the maximum amount provided by statute;

C.     Award all back pay lost since the date of constructive termination plus pre-judgment interest;

D.     Award attorney's fees, expert witness fees, and costs as provided by law;

E.     Award front pay;

F.     Retain jurisdiction over this action to assure full compliance with the order of this Court and with applicable law; and

G.     Grant such additional relief as this Court deems just and proper.

## COUNT VI
### Title VII Retaliation

120.    Plaintiff restates and realleges paragraphs 1-119 as if specifically set forth herein.

121.    42 U.S.C. § 2000e-3(a) makes it unlawful for an employer to discriminate against an employee because he opposes any practice which is unlawful under Title VII.

122.    Plaintiff's opposition to Defendant's discrimination, described above, is protected under 42 U.S.C. § 2000e-3(a).

123.    Defendant constructively terminated Plaintiff's employment in that SOTO was forced to resign in retaliation for his protected conduct.

WHEREFORE, Plaintiff respectfully requests that the Court:

A.     Find that Defendant discriminated against Plaintiff, in violation of Title VII of the Civil Rights Act of 1964;

B.     Award compensatory and punitive damages to the maximum amount provided by statute;

C.     Award all backpay lost since the date of constructive termination plus pre-judgment interest;

D.     Award attorney's fees, expert witness fees, and costs as provided by law;

E.     Award front pay;

F.     Retain jurisdiction over this action to assure full compliance with the order of this Court and with applicable law; for forward pay due to decrease in lower earnings; and

G.     Grant such additional relief as this Court deems just and proper.

## COUNT VII
### Title VII National Origin Harassment – Hostile Work Environment

124.    Plaintiff restates and realleges Paragraphs 123 as if specifically set forth herein.

125.    42 U.S.C. § 2000e-3(a) makes it unlawful for an employer to discriminate against an employee on the basis of national origin and affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.

126.    SOTO belongs to a protected group.

127.    SOTO was repeatedly subjected to unwanted harassment based on his national origin as set forth above.

128.    CICERO knew and/or should have known of the harassment and failed to take prompt remedial action.

129.    At all times hereto, SOTO acted reasonably under the circumstances.

130.    SOTO was constructively terminated in that he was forced to resign due to the hostile work environment inflicted upon him.

131.    CICERO is liable for the national origin harassment due to a hostile work environment inflicted upon SOTO due to CICERO'S violation of Title VII of the Civil Rights Act of 1964 as set forth above.

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Find that Defendant discriminated against Plaintiff, in violation of Title VII of the Civil Rights Act of 1964;

B.    Award compensatory and punitive damages to the maximum amount provided by statute;

C.    Award all backpay lost since the date of constructive termination plus pre-judgment interest;

D.    Award attorney's fees, expert witness fees, and costs as provided by law;

E.    Award front pay;

F.    Retain jurisdiction over this action to assure full compliance with the order of this Court and with applicable law; for forward pay due to decrease in lower earnings; and

G.    Grant such additional relief as this Court deems just and proper.

## COUNT VIII
### Title VII Disparate Treatment

132.    Plaintiff SOTO restates and realleges paragraphs 1-131 as if specifically set forth

herein.

133.    Defendant CICERO discharged and discriminated against Plaintiff SOTO with respect to the terms, conditions, and privileges of her employment on the basis of his national origin and age in violation of Title VII of the Civil Rights Act of 1964 and The Age Discrimination in Employment Act of 1967, as amended.

134.    Plaintiff SOTO was treated less favorably than others similarly situated, to include members of a different national origin and different age than Plaintiff SOTO.

135.    Defendant CICERO'S termination of Plaintiff SOTO'S employment was based on Plaintiff SOTO'S national origin and age.

136.    Defendant CICERO'S actions were done with malice and with reckless indifference to Plaintiff SOTO'S Federally protected rights.

WHEREFORE, SOTO seeks the following relief from CICERO:

A.    Find that Defendant discriminated against Plaintiff, in violation of Title VII of the Civil Rights Act of 1964 and The Age Discrimination in Employment Act of 1964, as amended;

B.    Enjoin Defendant from engaging in unlawful discrimination practices;

C.    Award Plaintiff back pay to compensate Plaintiff for loss of salary, employee benefits, promotions, and other loss of job opportunities he has suffered;

D.    Award compensatory and punitive damages to the maximum amount provided by statute;

E.    Award pre-judgment and post-judgment interest, as appropriate, on all amounts due to Plaintiff as a result of this action;

F.    Award attorney's fees, expert witness fees, and costs as provided by law;

G.    Award front pay;

H.    Retain jurisdiction over this action to assure full compliance with the order of this Court and with applicable law; and

I.    Grant such additional relief as this Court deems just and proper.

## COUNT IX
### Violation Of 50 ILCS 725/ Uniform Peace Officers' Disciplinary Act

137.    Plaintiff restates and realleges Paragraphs 136 as if specifically set forth herein.

138. Under 50 ILCS 725/2(b) an "Informal inquiry" means a meeting by supervisory or command personnel with an officer upon whom an allegation of misconduct has come to the attention of such supervisory or command personnel, the purpose of which meeting is to mediate a citizen complaint or discuss the facts to determine whether a formal investigation should be commenced.

139. Under 50 ILCS 725/2(c) a "Formal investigation" means the process of investigation ordered by a commanding officer during which the questioning of an officer is intended to gather evidence of misconduct which may be the basis for filing charges seeking his or her removal, discharge or suspension in excess of 3 days.

140. Under 50 ILCS 725/2(d) an "Interrogation" means the questioning of an officer pursuant to the formal investigation procedures of the respective State agency or local governmental unit in connection with an alleged violation of such agency's or unit's rules which may be the basis for filing charges seeking his or her suspension, removal, or discharge. The term does not include questioning (1) as part of an informal inquiry or (2) relating to minor infractions of agency rules which may be noted on the officer's record but which may not in themselves result in removal, discharge or suspension in excess of 3 days.

141. CICERO violated 50 ILCS 725/ Uniform Peace Officers' Disciplinary Act by removing SOTO from the detective division and demoting him to an officer for a period substantially longer than 3 days without conducting a formal investigation or interrogation in violation of the statute.

142. Under 50 ILCS 725/7 no officer shall be discharged, disciplined, demoted, denied promotion or seniority, transferred, reassigned or otherwise discriminated against in regard to his

or her employment, or be threatened with any such treatment as retaliation for or by reason of his or her exercise of the rights granted by this Act.

143.    CICERO disciplined, demoted, denied seniority, transferred, reassigned, and discriminated against SOTO in regard to his employment as retaliation for his exercise of the rights granted by 50 ILCS 725/ Uniform Peace Officers' Disciplinary Act.

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Find that Defendant discriminated against Plaintiff, in violation of 50 ILCS 725/ Uniform Peace Officers' Disciplinary Act;

B.    Award compensatory and punitive damages to the maximum amount provided by statute;

C.    Award attorney's fees, expert witness fees, and costs as provided by law;

D.    Retain jurisdiction over this action to assure full compliance with the order of this Court and with applicable law; for forward pay due to decrease in lower earnings; and

E.    Grant such additional relief as this Court deems just and proper.

## COUNT X
### Violation Of Illinois General Assembly Public Act 100-1001

144.    Plaintiff restates and realleges Paragraphs 143 as if specifically set forth herein.

145.    Under 65 ILCS 5/11-1-12, in pertinent part, a municipality may not require a police officer to issue a specific number of citations within a designated period of time. . . a municipality may not, for the purposes of evaluating a police officer's job performance, compare the number of citations issued by the police officer to the number of citations issued by any other police officer who has similar job duties.

146.    CICERO violated Illinois General Assembly Public Act 100-1001 under 65 ILCS 5/11-1-12 by utilizing a point system in order to compare the performance of officers whereby officers were forced to average a 3.0 point performance on a daily and monthly basis which was based on activities of the officers that includes, without limitations, moving violations, parking tickets, reports, arrests, gun seizures, and vehicle tows.

147.    CICERO utilized a point system against SOTO in order to compare his performance to other officers in violation of Illinois General Assembly Public Act 100-1001 under 65 ILCS 5/11-1-12.

WHEREFORE, Plaintiff respectfully requests that the Court:

A.    Find that Defendant discriminated against Plaintiff, in violation of 50 ILCS 725/ Uniform Peace Officers' Disciplinary Act;

B.    Award compensatory and punitive damages to the maximum amount provided by statute;

C.    Award attorney's fees, expert witness fees, and costs as provided by law;

D.    Retain jurisdiction over this action to assure full compliance with the order of this Court and with applicable law; for forward pay due to decrease in lower earnings; and

E.    Grant such additional relief as this Court deems just and proper.

Respectfully submitted,

/s/ Marc P. Trent
One of Plaintiff's Attorneys

Douglas P. Trent (ARDC #2855070)
Marc P. Trent (ARDC #6324928)
TRENT LAW FIRM, P.C.
350 S. Schmale Road, Suite 130
Carol Stream, IL 60188
P:  (630) 682-3100
F:  (630) 682-3554
attorneys@trentlawfirm.com

## CERTIFICATE OF SERVICE

I, Marc P. Trent, do hereby certify that on December 30, 2019, I served the foregoing Complaint, upon the following:

**Joe Virruso, Supervisor**
**Cicero Town Hall**
**4949 W. Cermak Road**
**Cicero, IL 60804**

/s/ Marc P. Trent
One of Plaintiff's Attorneys

Marc P. Trent (ARDC #6324928)
TRENT LAW FIRM, P.C.
350 S. Schmale Road, Suite 130
Carol Stream, IL 60188
P: (630) 682-3100
F: (630) 682-3554
*attorneys@trentlawfirm.com*